UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DARIUS STEEN, WILLIAM JUDSON, SR., RICHARD STEIN, KAREEM BACON and DOUG MOORE, as Class Representatives, on behalf of themselves and all others similarly situated,

                          Plaintiffs,

    v.

ASSURANT, INC.,

                          Defendant.

No. 1:22-cv-04571

---

### ORDER GRANTING DEFENDANT'S MOTION TO TRANSFER VENUE

McMahon, J.:

Plaintiffs Darius Steen, William Judson, Sr., Richard Stein, Kareem Bacon and Doug Moore ("Plaintiffs") bring this action against their employer, Assurant, Inc. ("Assurant" or "Defendant") alleging discrimination and retaliation under 42 U.S.C. Section 1981 and the Age Discrimination in Employment Act ("ADEA").

There are currently four open motions: (1) Defendant's motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(3), 12(b)(6), and 19(a)(1) (Dkt. No. 71); (2) Defendant's motion to transfer the case to the Northern District of Georgia pursuant to 28 U.S.C. § 1404(a) (Dkt. No. 73); (3) Plaintiffs' motion to amend their complaint (Dkt. No. 92); and (4) Plaintiffs' motion to strike additional documents filed by Defendant in support of its motion to dismiss and motion to transfer (Dkt. No. 97).

For the reasons that follow, Plaintiffs' motion to strike is denied, Defendant's motion to transfer is granted, and the court does not reach the motion to dismiss or the motion to amend.

# BACKGROUND

## I.     Parties

Plaintiff Darius Steen is a resident of Florida. He currently is a District Manager in the Southeast Region of Assurant. Second Amended Complaint ("SAC" Dkt. No. 59) ¶ 36; Dkt. No. 49 ¶ 9.

Plaintiff William Judson, Sr. is a resident of Georgia. He was a District Manager in the Southeast Region of Assurant from 2011 until he was fired in January 2021. SAC ¶ 37, 152, 177; Dkt. No. 49 ¶ 10.

Plaintiff Richard Stein is a resident of Florida. He currently is a District Manager in the Southeast Region of Assurant. SAC ¶¶ 38, 187, 194; Dkt. No. 49 ¶ 11.

Plaintiff Kareem Bacon is a resident of Georgia. He currently is a District Manager in the Southeast Region of Assurant. SAC ¶¶ 39, 231; Dkt. No. 49 ¶ 12.

Plaintiff Doug Moore is a resident of Maryland. He is a former Senior Channel Optimization Executive at Assurant who worked in the Washington D.C. area. SAC ¶ 40, 243. Moore joined Assurant in 2019 and alleges that he was constructively discharged in May 2022. *Id.* ¶ 242, 267; Dkt. No. 49 ¶ 13.

Defendant Assurant, Inc. is a seller of various finance and insurance products. SAC ¶ 3. Defendant is a Delaware corporation. *Id.* ¶ 41. Defendant is a holding company that conducts business through operating subsidiaries using the trade name "Assurant." Dkt. No. 48 ¶ 6. Defendant's subsidiaries operate Global Business Units, one of which is Global Lifestyle. Dkt. No. 43 ¶ 9. Plaintiffs and proposed Class Members work within Global Lifestyle. SAC ¶ 4.

## II.    Factual Background

Plaintiffs are current or former employees within Assurant's Global Lifestyle segment. Plaintiffs Steen, Judson, Stein, and Bacon work (or have worked) within Global Automotive –

selling insurance policies to automotive dealership customers. Dkt. No. 49 ¶¶ 9-12; Dkt. No. 50 ¶ 14. Plaintiff Moore worked within Connected Living – selling insurance policies for consumer electronics. SAC ¶ 3; Dkt. No. 49 ¶ 13; Dkt. No. 50 ¶ 12.

Plaintiff Steen joined a predecessor of Assurant in 2007. *Id.* ¶ 85. Since then, Steen has reported directly to Brandon Brown, who reported directly to Joe Amendola and Ash Bauer. *Id.* ¶ 86. In 2008, Steen was promoted to a District Manager and in 2011 he was promoted to an Area Manager position in Assurant's Southeast Region, which includes Florida, Puerto Rico, Southeast Georgia and South Alabama.[1] *Id.* ¶ 87.

Steen alleges that, since 2011, Brown, Amendola and Bauer refused to promote him further into to the role of Regional Manager. *Id.* ¶ 91. Instead the role was given to white employees who had less experience and educational background. *Id.* ¶ 99-107. This was despite Steen's consistently ranking as a top performing Area Manager each year. *Id.* ¶ 91-96. Steen alleges that he complained through his annual reviews about the racial discrimination he faced and lack of promotions, however, Brown either did not respond or made disparaging comments such as "Why don't you just retire? How much longer are you going to work?" *Id.* ¶ 112-116.

Steen also alleges that an Area Manager based in Atlanta – Tom Bond – repeatedly engaged in racially-biased statements to employees, including Steen. *Id.* ¶ 117-122. When Steen complained to Brown about Bond, Brown defended the conduct and refused to report anything to HR. *Id.* ¶ 128. Steen therefore sent an email directly to Human Resources ("HR") regarding Bond. As a result, Brown refused to talk to Steen or answer his telephone calls for months. *Id.* ¶ 133.

---

[1] Neither party has provided office locations for the five named Plaintiffs for the relevant period.

In 2022, Steen was demoted to the role of Direct Manager and stripped of his most lucrative accounts. *Id.* ¶ 138, 143. Steen complained via email to top executives Martin Jenns and Jeff Strickland. *Id.* ¶ 149. He received an email three months later stating that an investigation had been conducted and that none of Steen's allegations were sustained. *Id.* ¶ 151.

Plaintiff Judson joined Assurant as a District Manager in 2011. *Id.* ¶ 152. At all relevant times, his immediate supervisor was Bond, who reported directly to Brown. Judson alleges that Bond made racially discriminatory statements to him, including that he believed "slaves had made it" because they were "well taken care of." *Id.* ¶ 155. Bond also made threatening statements regarding Judson's employment, such as "I will figure out a way to get rid of your old black ass" and that he wanted to get rid of Judson because he was "too old." *Id.* ¶ 157-158. When Judson asked Brown for a promotion, he was told he needed to be a "Training District Manager" first – a position that allegedly did not exist and did not apply to white employees that were promoted. *Id.* ¶ 162-64.

During the Covid-19 pandemic, Judson was concerned about getting sick but Bond threatened that Judson would be fired if he did not work in person. *Id.* ¶ 167. In October 2020, Judson complained to HR about Bond, reporting discrimination based on race, age, and disability. *Id.* ¶ 169. He asked to be transferred to another manager. *Id.* ¶ 170. Subsequently, Bond removed accounts from Judson, and did not provide him with his annual performance raise.

In December 2020, after hearing nothing further from HR, Judson told Brown about his complaint and again asked to be transferred from Bond. *Id.* ¶ 174-175. Four days later, Brown told Judson that he was fired for document and record keeping failures. *Id.* ¶ 177. After Judson

submitted a charge to the Equal Employment Opportunity Commission ("EEOC"), Assurant

fired Judson's son, who had been working at Assurant for six years. *Id.* ¶ 178.

Plaintiff Stein joined Assurant as a Finance and Insurance specialist in 2014. During his

initial training period he learned that he was paid 15 to 20 percent less than a white peer, despite

being told that all trainees were paid the same compensation. *Id.* ¶ 182-183. Although Stein

outperformed white coworkers, he was required to remain in training for 11 months while white

trainees were promoted ahead of him. *Id.* ¶ 182. In 2015, Stein was promoted to the District

Manager position. He reported to Lee Perez and Chris Renner, who both reported directly to

Brown. *Id.* ¶ 185. On being hired, Stein had been promised that he would be assigned to the

Tampa/Florida district, but instead he was assigned to a sales district in Georgia and South

Carolina. *Id.* ¶ 187. Stein was told that if he didn't accept his assignment and move to Savannah,

Georgia, he would lose his job at Assurant. *Id.* ¶ 188.

In 2017, Stein moved to Jacksonville, Florida but his sales territory was not changed. *Id.*

¶ 194. Stein was required to travel back and forth to Savannah, Georgia, but he did not receive

reimbursement for any costs of travel, unlike white District Managers who resided far from their

sales territory. *Id.*

Stein alleges that he was passed over for job opportunities in Florida and for pay raises,

which were given to white peers. *Id.* ¶¶ 196-199. Stein approached Brown on multiple occasions

regarding the pay disparity between black and white employees but was rebuked. *Id.* ¶¶ 209-212.

After Stein filed an anonymous complaint through a portal in November 2020, Assurant

responded that an investigation was underway. However, nothing subsequently occurred, and on

June 9, 2021 the complaint was marked closed. *Id.* ¶¶ 213-215.

Plaintiff Bacon has been a manager at Assurant and its predecessor for over seven years. In July 2018 he became a District Manager in the Southeast Region. *Id.* ¶ 227. Since 2020, he was either first or second highest performing District Manager in the region, yet his pay went unchanged during that period and Assurant removed him from accounts and gave them to worse performers. *Id.* ¶¶ 228-29.

Bacon alleges that he received racist remarks from Bond on multiple occasions. For example, during a work trip in Georgia, Bacon was asked by Bond to explain why he took offense at the Confederate flag and then was subsequently told that he was wrong and that slaves had "been treated well by slaveholders" and were lucky to have been brought to America. *Id.* ¶¶ 235-36. On another occasion, Bond explained to Bacon that, while he did not hate Bacon's race, he did hate the "culture" of that race. *Id.* ¶ 238.

Unlike the four other Plaintiffs, Plaintiff Moore did not work within Global Automotive or in the Southeast Region. Instead, Moore joined Assurant's Connected Living division in 2019, worked in the Washington D.C. area. *Id.* ¶¶ 238-39. Despite being a top performing Senior Channel Optimization Executive, Moore alleges that he was regularly passed over for promotion in favor of white employees. *Id.* ¶¶ 243-244, 245-258. For example, Moore alleges that he lost one promotion because he was told the new responsibilities would be too difficult for him due to his wife's pregnancy. However, the individual promoted also had a pregnant wife at the time. ¶¶ 262-63. In 2021, Moore complained about an incident where another employee took credit for his presentation; he also complained about his many lost promotion opportunities at Assurant. *Id.* ¶ 260. The HR investigator allegedly found a pretext to dismiss the complaint. While the investigator indicated that the investigation had turned up several problems, she did not tell Moore what these problems were. *Id.*

Moore left Assurant in May 2022. *Id.* ¶ 261. He alleges that he was constructively discharged. *Id.* ¶ 267.

### III.    Procedural Posture

Plaintiffs Judson and Bacon filed Charges of Discrimination with the Atlanta, Georgia District Office of the EEOC on May 25, 2021 and September 28, 2022 respectively. Dkt. No. 72-3 ¶ 6, 9. Plaintiffs Steen and Stein filed Charges with the EEOC's Miami, Florida District Office on April 14, 2021 and April 30, 2022 respectively. *Id.* ¶ 7-8. Plaintiff Moore filed with the Baltimore, Maryland District Office on September 27, 2022. *Id.* ¶ 10.

On June 2, 2022, Plaintiffs Steen, Judson, and Stein filed an initial complaint in this action against Assurant Inc. and three individual Assurant employees. Dkt. No. 1.

On July 7, 2022, Plaintiffs filed an amended complaint, adding Plaintiffs Bacon and Moore. Dkt. No. 16. Defendants moved to dismiss the first amended complaint. Dkt. No. 31, 39. Defendants also filed a motion to transfer the case to the Northern District of Georgia. Dkt No. 46.

On September 29, 2022, Plaintiffs filed the SAC, omitting certain claims and dismissing the individual defendants. Dkt. No. 59. On November 14, 2022, Defendant Assurant, Inc. filed a renewed motion to dismiss the SAC for lack of venue pursuant to Fed. R. Civ. P. 12(b)(3), for failure to state a claim pursuant to 12(b)(6), and for failure to join American Bankers Insurance Company of Florida ("ABIC") – who Defendant asserts is or was all of Plaintiffs' actual employer – as a required party under 19(a)(1).[2] Dkt. No. 71, 72. Defendant filed a renewed motion to transfer on the same day. Dkt. No. 73.

---

[2] In its motion to transfer, Defendant asserts that it "reserves the right to contest its purported status as an integrated employer at the appropriate time." Dkt. No. 74 at 2.

On January 31, 2023, Plaintiffs filed a motion to amend the SAC. Dkt. No. 92. On February 10, 2023, Defendant filed a notice of supplemental facts relevant to its motion to transfer and motion to dismiss. Dkt. No. 95. Plaintiffs submitted a motion to strike these supplemental facts on February 13, 2023. Dkt. No. 97.

## LEGAL STANDARD

A district court may, in its discretion, "transfer any civil action to any other district or division where it might have been brought," in such cases where transfer is warranted "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a).

The party moving to transfer venue carries the "burden of making out a strong case for transfer," and must demonstrate that transfer is proper by "clear and convincing evidence." *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114 (2d Cir. 2010) (quotation marks omitted). The moving party must establish "1) that the action is one that 'might have been brought' in the district to which the movant seeks to have it transferred, and 2) that transfer is appropriate based on the convenience of the parties, the convenience of witnesses, and the interests of justice." *Posven, C.A. v. Liberty Mut. Ins. Co.*, 303 F.Supp.2d 391, 400–01 (S.D.N.Y. 2004). One decides whether an action "might have been brought" in a particular district with reference to the facts as they existed at the time the complaint was filed. *Hoffman v. Blaski*, 363 U.S. 335, 342-43 (1960) ("where [the action] might have been brought" in Section 1404(a) "directs the attention of the judge who is considering a transfer to the situation which existed when suit was instituted.").

"District courts have broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered on a case-by-case basis." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006). This determination rests within

the "sound discretion" of the district court. *Posven, C.A.*, 303 F.Supp.2d at 401. Of particular

note, there is no requirement that a the convenience analysis of a Section 1404 motion be

decided on the basis of the facts as they existed at the time the complaint was filed; facts that

arise after the initiation of a suit may factor into the court's analysis. *Stewart Org., Inc. v. Ricoh*

*Corp.*, 487 U.S. 22, 34, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (Scalia, J., dissenting) ("[C]ourts

in applying § 1404(a) have examined a variety of factors, each of which pertains to facts that

currently exist or will exist.").

**DISCUSSION**

**I.    The Motion to Strike Defendant's Additional Facts Relevant to the Motion to Transfer**
**is Denied**

Plaintiffs seek to strike Defendant's "Notice of Supplemental Facts Relevant to its

Motion to Transfer and Motion to Dismiss" (the "Supplemental Facts"). Dkt. No. 95. Defendant

filed the Supplemental Facts on February 10, 2023. The filing states that it describes factual

events that occurred and/or became known to Defendant after briefing on its motion to transfer

venue and motion to dismiss was completed on January 6, 2023. *Id.* at 1. The Supplemental Facts

contains two categories of information: (1) information about Plaintiffs' EEOC proceedings,[3]

and (2) information concerning the relocation of Defendant's headquarters. The latter fact states,

"On February 7, 2023, Assurant, Inc. formally announced that it relocated its corporate

headquarters and principal executive office from New York, New York to Atlanta, Georgia."

---

[3] This information pertains to Defendant's motion to dismiss. Defendant asserts that the fact that
Plaintiffs continue to actively pursue their Title VII claims in the EEOC demonstrates that
Plaintiffs' dismissal of their Title VII claims in the SAC was not a true abandonment of these
claims but a tactical and temporary maneuver to escape Title VII's exclusive venue provision.
*See* 42 U.S.C. § 2000e-5(f)(3); Dkt. No. 101 at 5.

Dkt. No. 95 at 2-3. The SEC filing with the public announcement of the relocation is included as an exhibit. Dkt. No. 96-6. Only this second fact is relevant to the motion to transfer.

Plaintiffs argue that the Supplemental Facts must be stricken, stating that: the filing was procedurally improper as it was untimely, that Defendant "seek[s] to reverse the burden [of persuasion]" on the motion to transfer by filing the Supplemental Facts without an accompanying explanation in order "to trigger a response from Plaintiffs;" and that Defendant has not demonstrated relevance because the Supplemental Facts were submitted without any explanation for why they impacted Defendant's motion. Dkt. No. 98 at 3.

"Motions to strike are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute." *Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A.*, 596 F. Supp. 2d 821, 829 (S.D.N.Y. 2008) (internal quotation marks and citation omitted). Motions to strike will only be granted when "there is a strong reason for so doing." *Hargett v. Metro. Transit Auth.,* F.Supp.2d 393, 404 (S.D.N.Y.2008).

Here, the relocation of Defendant's headquarters clearly has a bearing on the motion to transfer. Plaintiffs assert various arguments in their opposition to the motion to transfer that concern the location of Defendant's headquarters. For example, Plaintiffs argue that relevant documents are currently located at Assurant's headquarters and that relevant decision and policymakers work there. *See, e.g.*, Dkt. No. 77 at 4, 20-22. In particular, Plaintiffs allege that Defendant's "common, centralized policymaking" emanates from its New York offices and therefore the headquarters is the locus of operative facts for this case. *Id.* at 21. These arguments necessarily implicate the location of Defendant's headquarters and make its relocation relevant to the decision to transfer the case.

Of course, Defendant undoubtedly knew at the time it made its motion to transfer that the headquarters move was impending; such things do not occur on short notice. Assurant owes the court an explanation for why it waited to inform the court of this highly relevant development until after briefing had closed on the motion to transfer. However, the court is not inclined to ignore the fact that, for the duration of this lawsuit, Assurant will not be located in the Southern District of New York. I thus deny the motion to strike and will consider the fact that Defendant's headquarters has relocated as part of the motion to transfer.

## II.    The Motion to Transfer To The Northern District of Georgia is Granted

### A.  The Action Might Have Been Brought in the Northern District of Georgia

A "district where [a case] might have been brought" is a district where venue would have been proper and where personal jurisdiction exists over the defendant. *Wils v. Schulman*, 1991 WL 143444, at *1 (S.D.N.Y. July 24, 1991). Section 1404(a) does not permit transfer to a forum that acquires personal jurisdiction over the defendants after the filing of a lawsuit, either through consent or by the defendant's becoming a citizen of that forum. *Blaski*, 363 U.S. at 342-43.

#### a.  *Personal Jurisdiction Exists Over Assurant, Inc. in Georgia*

Defendant asserts that it applied for and received authorization to do business in the State of Georgia in 2004. It is therefore a "resident foreign corporation" and so is subject to general jurisdiction in Georgia under *Cooper Tire & Rubber Co. v. McCall*, 863 S.E.2d 81, 90 (Ga. 2021).

In *Cooper Tire*, the Supreme Court of Georgia upheld the "consent by registration" theory of general personal jurisdiction. Specifically, the court reaffirmed its prior holding in *Allstate Insurance Co. v. Klein*, 262 Ga. 599, 422 S.E.2d 863 (1992), which held that Georgia courts may exercise general personal jurisdiction over any out-of-state corporation that is "authorized to do or transact business in this state at the time a claim or cause of action arises."

11

422 S.E.2d 863. Relying on the Supreme Court's decision in *Pennsylvania Fire Insurance Co. of Philadelphia v. Gold Issue Mining & Milling Co.*, 243 U.S. 93 (1917), which sanctioned general jurisdiction by consent, the Georgia court stated that "where a state statute notifies an out-of-state corporation that by registering and appointing an agent for service of process in the state, the corporation has consented to general personal jurisdiction there, the corporation has not been deprived of the Fourteenth Amendment's guarantee of due process of law when it is sued in that state." *Cooper Tire*, 863 S.E.2d at 85.

The Supreme Court's recent decision in *Mallory v. Norfolk Southern Railway Co.*, 600 U.S. ____ (June 27, 2023), confirmed that consent by registration does not violate due process. In *Mallory*, the Court considered a Pennsylvania law requiring out-of-state companies that register to do business in Pennsylvania to agree to appear in its courts on "any cause of action" against them. The Pennsylvania Supreme Court had concluded that this exercise of jurisdiction violated Due Process under *Daimler AG v. Bauman*, 571 U.S. 117, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014) and *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011). *Mallory v. Norfolk S. Ry. Co.*, 266 A.3d 542, 565 (Pa. 2021), cert. granted, 212 L. Ed. 2d 605, 142 S. Ct. 2646 (2022), and vacated and remanded, (U.S. June 27, 2023). Noting the split between the Pennsylvania Supreme Court's decision in *Mallory* and the Georgia Supreme Court's decision in *Cooper Tire*, the Court found that later decisions (such as *Daimler*) had not "implicitly overruled" *Pennsylvania Fire's* rule, which the facts of *Mallory* fell "squarely" within. *Id.* at 12. The Supreme Court thus held that the Due Process Clause did not prohibit Pennsylvania, or any other state, from requiring an out-of-state corporation to consent to personal jurisdiction in order to do business there.

Given the Georgia Supreme Court's decision in *Cooper Tire* and the Supreme Court's recent affirmation of "consent-by-registration" in *Mallory*, general personal jurisdiction exists over Defendant in Georgia in light of its registration to do business in the state.

   *b.  Venue is Proper in the Northern District of Georgia*

Under 28 U.S.C. § 1391(b), a civil action may be brought in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

Under § 1391(c), an "entity with the capacity to sue and be sued" resides in any judicial district where it is subject to personal jurisdiction with respect to the civil action in question. *See* 28 U.S.C. § 1391(c)(2).

As general personal jurisdiction exists in Georgia over Defendant, venue is proper in the Northern District of Georgia.

   B.  <u>Transfer is Appropriate Based on the Convenience of the Parties, Convenience of Witnesses and Interests of Justice</u>

As this case "might have been brought" in the Northern District of Georgia, transfer depends on an analysis of the so-called "convenience" factors. *Gottdiener*, 462 F.3d at 107. These factors include: "(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties." *N.Y. Marine*, 599 F.3d at 112. The court may also consider "Trial efficiency and the interest of justice . . . in a

§ 1404(a) transfer analysis," which can "be determinative in a particular case." *Liberty Mut. Ins. Co. v. Fairbanks Co.*, 17 F. Supp. 3d 385, 397 (S.D.N.Y. 2014).

"There is no rigid formula for balancing these factors and no single one of them is determinative." *Citigroup Inc. v. City Holding Co.*, 97 F.Supp.2d 549, 561 (S.D.N.Y. 2000). "Instead, weighing the balance is essentially an equitable task left to the Court's discretion." *Beatie and Osborn LLP v. Patriot Scientific Corp.*, 431 F.Supp.2d 367, 395 (S.D.N.Y. 2006) (internal quotations and citation omitted). "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Aerotel, Ltd. v. Sprint Corp.*, 100 F.Supp.2d 189, 197 (S.D.N.Y.2000) (internal quotations and citation omitted).

Here, the factors weigh strongly in favor of transfer.

### a. *The Plaintiffs' Choice of Forum*

Generally, courts give a plaintiff's choice of forum "considerable weight." *See Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, 928 F. Supp. 2d 735, 748 (S.D.N.Y. 2013).

However, the fact that a plaintiff "is not a citizen of the Southern District of New York and has no particular connection to the Southern District of New York diminishes the deference afforded its choice to litigate here." *City of Pontiac Gen. Employees Ret. Sys. v. Dell Inc.*, No. 14-cv-3644, 2015 WL 12659925, at *4 (S.D.N.Y. Apr. 30, 2015) (citing *Zepherin v. Greyhound Lines Inc.*, 415 F. Supp. 2d 409, 411 (S.D.N.Y. 2006)). None of the Plaintiffs resides in this district. They hale from Georgia, Florida, and Maryland, which is also where they worked and where their claims arose. The fact that, Plaintiffs "seek[] to represent a nationwide class . . . further diminishes the deference afforded its choice of forum." *JM Smith Corp. v. AstraZeneca Pharms. L.P.*, No. 19 CIV. 7233 (CM), 2020 WL 4605241, at *9 (S.D.N.Y. Aug. 11, 2020).

There is no connection between the events pleaded in the SAC and this district. None of the discriminatory actions alleged in the SAC occurred in New York. The only references to New York in the SAC are to mention that Assurant's (now former) headquarters were located in New York City, and that Plaintiff Moore traveled to New York on occasion for meetings.[4] SAC ¶¶ 41, 243-45.

Plaintiffs argue that there is in fact a connection to New York because Assurant, Inc. promulgated all relevant employment policies of the company out of its headquarters. Plaintiffs cite *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 474 (S.D.N.Y. 2013) for the proposition that venue is proper at the place of a company's headquarters when the company-wide policies and practices "emanate from the company's headquarters."

However, in *Kassman* the court found that venue was proper at the Company's headquarters because the plaintiff "brought a disparate impact claim challenging various company-wide policies and practices" and that the complaint "plausibly allege[d] that these policies and practices 'emanate from the Company's New York headquarters.'" In addition, the defendant "ha[d] not submitted any evidence contradicting that allegation." 925 F. Supp. 2d 453.

Here, Plaintiffs do not specify any particular Assurant company-wide policy that they argue led to the discrimination alleged in the SAC. Instead, the SAC only alleges, in conclusory fashion, that Defendant engages in unidentified "discriminatory employment practices that disproportionately affect Black employees' compensation," such as through having "a discretionary compensation system," "a discretionary promotion system," and "a discretionary performance evaluation system." SAC ¶ 77. No allegations of fact support these conclusory

---

[4] The SAC does not allege that any discrimination occurred while Moore was in New York for his meetings.

claims, and the facts that are pleaded (in great detail) make it clear that Plaintiffs are challenging individualized decisions made by local managers who are not alleged to have been following any policies or directives from headquarters.

Moreover, the SAC does not plausibly allege that any policies or practices emanated from Assurant, Inc.'s New York headquarters because it does not allege it at all. Only in their opposition brief do Plaintiffs state that it is "highly likely that these discriminatory policies originated at Assurant, Inc.'s New York City headquarters." This assumption is based on their assertion that Assurant, Inc.'s CEO Keith Demmings and Chief Administrative Officer Francesca Luthi, who has been "spearheading changes in HR policies," would be found here. Dkt. No. 77 at 4; *see also* SAC ¶ 47.

A party cannot use a brief to amend a deficient complaint. Moreover, Defendant has submitted evidence to demonstrate that any alleged discriminatory policies did not emanate from its New York headquarters.[5] First, contrary to Plaintiffs' assertion, Defendant submitted declarations stating that Assurant, Inc.'s CEO Keith Demmings has lived and worked in the Atlanta, Georgia area since 2013 (Dkt. No. 91 ¶ 6), and Francesca Luthie, the CAO, lives in Park City, Utah and has been officed in Miami, Florida since 2017. Dkt. No. 91 ¶ 7. Moreover, Defendant produced declarations stating that: the promotion, compensation, and termination decisions at issue in the SAC were all made outside of the State of New York (Dkt. No. 48 at ¶ 16; Dkt. No. 49 ¶ 39); no member of senior management of Connected Living or Automotive (the two divisions of Assurant in which Plaintiffs' work/worked) lives in New York (Dkt. No. 43 ¶ 17); and no hard copy documents regarding the management of Connected Living or

_____

[5] *Mohsen v. Morgan Stanley & Co. Inc.*, No. 11 CIV. 6751 PGG, 2013 WL 5312525, at *3 (S.D.N.Y. Sept. 23, 2013) ("In deciding a motion to transfer, a court may consider material outside of the pleadings.").

Automotive are in New York (Dkt. No. 43 ¶¶ 15, 16). Moreover, to extent that any Assurant, Inc.

decision/policymakers did at one time work out of the New York headquarters, or that any

relevant information concerning policies and practices existed in the New York headquarters,

these people and that information can no longer be found in New York following Assurant's

relocation of its headquarters to Georgia.

Finally, Plaintiffs assert that the availability of appropriate legal assistance is a legitimate

reason for choosing a forum and that counsel for Plaintiffs – who has particular experience in

race-discrimination class actions – are New York City based. Dkt. No. 77 at 10. Plaintiffs cite

*Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) for the proposition that the

"availability of appropriate legal assistance" is one factor to consider in a *forum non conveniens*

analysis.

But Plaintiffs have not asserted that their counsel would be unable to litigate in the

Northern District of Georgia – indeed, Defendant has produced evidence demonstrating that

Plaintiffs' counsel have litigated cases in states across the country, including the Northern

District of Georgia. Dkt. No. 90 ¶¶ 7-20. Nor have Plaintiffs demonstrated that there are no

competent lawyers in and around Atlanta who could bring such a case on their behalf.

"Convenience of counsel is not an appropriate factor to consider on a motion to transfer," and so

does not warrant deference to Plaintiffs' choice of forum. *Invivo Rsch., Inc. v. Magnetic*

*Resonance Equip. Corp.*, 119 F. Supp. 2d 433, 438 (S.D.N.Y. 2000).

In sum, as there is "little material connection" between Plaintiffs' chosen forum and the

facts or issues of this case, the presumption of deference to Plaintiffs' choice of forum does not

apply. *Bordiga v. Directors Guild of America*, 159 F.R.D. 457, 462 (S.D.N.Y.1995); *see also*

*Cook v. UBS Fin. Servs., Inc.*, No. 05 CIV. 8842 (SHS), 2006 WL 760284, at *7 (S.D.N.Y. Mar.

21, 2006). Therefore, Plaintiffs' forum choice does not counsel strongly against transfer in this case.

> b. *The Convenience of Witnesses*

"Convenience of both the party and non-party witnesses is probably the single-most important factor in the analysis of whether transfer should be granted." *Fuji Photo Film Co., Ltd. v. Lexar Media, Inc.*, 415 F.Supp.2d 370, 373 (S.D.N.Y. 2006) (internal citation omitted). Moreover, "[t]he convenience of non-party witnesses is accorded more weight than that of party witnesses." *Indian Harbor Ins., Co. v. Factory Mut. Ins. Co.,* 419 F.Supp.2d 395, 402 (S.D.N.Y. 2005) (internal citations omitted). When weighing this factor, "a court does not merely tally the number of witnesses who reside in the current forum in comparison to the number located in the proposed transferee forum. Instead, the court must qualitatively evaluate the materiality of the testimony that the witnesses may provide." *Herbert Ltd. Partnership v. Electronic Arts Inc.,* 325 F.Supp.2d 282, 286 (S.D.N.Y.2004); *accord Fuji Photo Film Co., Ltd.,* 415 F.Supp.2d at 373.

Defendant identifies five key party witnesses who reside in the Northern District of Georgia. Three of these individuals are mentioned in the SAC – Jeff Strickland, Ana Rosado-Reyes, and Christine Bieller. SAC ¶¶ 142, 149, 169, 230. The remaining two individuals are senior management at Assurant – one is the President of U.S. Connected Living and the other is the senior HR officer responsible for the Connected Living line of business. Dkt. No. 74 at 15. Defendant also identifies eight additional witnesses that live in closer proximity to the Northern District of Georgia than the Southern District of New York (Florida, North Carolina, and South Carolina). Six of these witnesses are identified in the SAC.

In addition, Defendant identifies Tom Bond as a key non-party witness who lives in the suburbs of Atlanta, Georgia. Dkt. No. 45 ¶ 15. Defendant notes that Bond features prominently in the SAC and would testify regarding various matters alleged in the SAC including regarding

discriminatory comments (SAC ¶¶ 6-9, 117-22, 152-57, 236-240); issues pertaining to firearms (*id.* ¶¶ 123-127); compensation (*id.* ¶¶ 165, 173); disability discrimination (*id.* ¶¶ 166-168); age discrimination (*id.* ¶¶ 157-60); and retaliation (*id.* ¶¶ 172-77). Defendant also identifies a former Vice President for Diversity, Equity, and Inclusion as a potential non-party witness who lives in Georgia, as well as John Laudenslager, the outgoing President of U.S. Automotive, who is mentioned in the SAC and lives in South Carolina. *Id.* ¶ 65, 66, 149. Finally, Defendant asserts that there are other unnamed witnesses mentioned in the SAC that live in Savannah and "rural Georgia." *See* SAC ¶¶ 190-92.

In contrast, Plaintiffs name only two alleged New York witnesses whom they wish to depose: (1) the CEO of Assurant, Inc., and (2) the Chief Administrative Officer. In addition, Plaintiffs assert that they wish to depose "multiple Rule 30(b)(6) witnesses" about Assurant, Inc.'s nationwide employment policies and they argue that "it is extremely likely there will be other relevant witnesses in New York City."

Unfortunately for Plaintiffs they have their facts wrong – or facts have changed, Assurant, Inc.'s CEO Keith Demmings has lived and worked in the Atlanta, Georgia area since 2013 (Dkt. No. 91 ¶ 6), and the Chief Administrative Officer, Francesca Luthie, lives in Park City, Utah and works in Miami, Florida. Dkt. No. 91 ¶ 7. In addition, Assurant, Inc.'s headquarters have relocated to Atlanta, Georgia, so if there were potentially relevant corporate witnesses who were once located in New York, they are now in Georgia. Plaintiffs have not in fact identified any witnesses located in New York.

Plaintiffs next argue that Defendant's list of witnesses is defective because it includes individuals who they argue are not "key witnesses." Specifically, Plaintiffs point to individuals named in the SAC who were either comparators to Plaintiffs but not decisionmakers or who

Plaintiffs argue were just "named in the Complaint purely in passing." Dkt. No. 77 at 16. As a result, they assert that only eight individuals from Defendant's list are truly key witnesses and, of these eight, only three live in Georgia, while the others live in Florida, North Carolina, or South Carolina. Plaintiffs emphasize that other key witnesses reside across the rest of the country: for example they argue that, "two of the most important decision-makers" in the SAC – Bauer and Amendola –live in Chicago.

But the fact that some of the people identified by Assurant are not decisionmakers or "key" in Plaintiffs' view does not mean they are not percipient witnesses to the events alleged. And Florida and the Carolinas are closer to Atlanta than to New York.

Plaintiffs contest that, as the witnesses living out of state will likely need to fly to the Northern District of Georgia, a flight to New York is "of only marginal extra length," (Dkt. No. 77 at 16); they note that "Courts in this circuit regularly attach little significance to differences in travel time when the party moving for transfer will have to travel anyway." *Adirondack Transit Lines, Inc. v. Greyhound Lines, Inc.*, No. 115CV01227LEKCFH, 2016 WL 5415772, at *5 (N.D.N.Y. Sept. 28, 2016). But Plaintiffs do not analyze whether witnesses located in, say, South Carolina will have to fly to Atlanta in order to get to New York, but this court would be shocked if at least some of witnesses located in the Southeastern United States did not have to go through Atlanta to get to New York. They may as well stop there.

Therefore, the court finds that this factor weighs in favor of transfer.

c.   *The Location of the Relevant Documents and the Relative East of Access to Sources of Proof*

Defendant notes that "'In an era of electronic documents, easy copying and overnight shipping, [the location of documents and other sources of proof] assumes much less importance than it did formerly.'" Dkt. No. 74 at 18 (quoting *ESPN, Inc. v. Quiksilver, Inc.*, 581 F. Supp. 2d

542, 548 (S.D.N.Y. 2008)). Nonetheless, it argues that this factor supports transfer. Defendant

states that, while many documents are maintained electronically (on servers located in Assurant's

offices near Atlanta), any hard copy documents that exist are likely to be located at the Assurant

facility in the Northern District of Georgia, including documents related to HR investigations in

connection with the internal complaints allegedly submitted by Steen, Stein, Judson. SAC

¶¶ 149, 169, 213-14; Dkt. No. 49 ¶¶ 37-38. Conversely, Defendant asserts that no employment

related documents regarding any of the employment decisions at issue in the SAC are maintained

in New York. Dkt. No. 48 ¶¶ 12-16.

Plaintiffs simply argue in response that recent HR overhauls have been implemented by

Assurant's CEO and Chief Administrative Officer and, as a result, "there is every good reason to

believe that relevant documents are at Assurant, Inc.'s New York City headquarters." Dkt. No.

77 at 21.

But conjecture is trumped by facts. There no longer are any New York City headquarters.

End of story.

While Plaintiffs are correct that even hard copies located in Georgia could be produced

with little difficulty, the court agrees that this factor favors transfer in this case.

### d.  *Convenience of the Parties*

Defendant argues that transfer would be more convenient, or at worst neutral, for all

parties to this case. Specifically, Defendant notes that Plaintiffs Judson and Bacon live in

Georgia (SAC ¶¶ 37, 39); Plaintiffs Stein and Steen both live in the neighboring state of Florida

(*Id.* ¶¶ 36, 38); and Plaintiff Moore lives in Maryland. *Id.* ¶ 40. As a result, Defendant argues that

this factor favors transfer for all Plaintiffs except Plaintiff Moore, for whom it is neutral.

Plaintiffs counter that Defendant cannot rely on the inconvenience of Plaintiffs in making

this argument, especially in light of the fact that all Plaintiffs have expressed that travel to New

York City is not difficult or burdensome, and most of them travel to New York City on a regular

basis. Dkt. No. 77 at 20. Plaintiffs assert that Defendant must instead argue why venue in the

Southern District of New York is inconvenient for it, which Defendant cannot do as its

headquarters are located there. Once again, Plaintiffs rely on outdated information. In light of

Defendant's relocation of its headquarters to Atlanta, Georgia, the Northern District of Georgia

is the more convenient forum.

 Given the location of Plaintiffs and Defendant, this factor weighs in favor of transfer.

  *e. Locus of Operative Facts*

 "The location of operative facts is a primary factor in determining a § 1404(a) motion to

transfer." *Rosen v. Ritz–Carlton Hotel Co. LLC*, 2015 WL 64736, at \*4 (S.D.N.Y. Jan. 5, 2015).

"To determine the locus of operative facts, a court must look to the site of the events from which

the claim arises." *Dickerson v. Novartis Corp.*, 315 F.R.D. 18, 30 (S.D.N.Y. 2016). "Where there

is 'no material connection between this district and the operative facts, . . . the interests of justice

require the transfer of [the] action.'" *Brown v. Dow Corning Corp.*, No. 93CIV.5510(AGS),

1996 WL 257614, at \*2 (S.D.N.Y. May 15, 1996) (citing *Mobile Video Servs., Ltd. v. National*

*Ass'n of Broadcast Employees and Technicians, AFL-CIO*, 574 F.Supp. 668, 671 (S.D.N.Y.

1983)).

 Plaintiffs' argument that New York is the "locus of operative facts" rests again on the

fact that Assurant Inc.'s headquarters are there and therefore it is the "likely source of offending

employment policies." Dkt. No. 77 at 21. Plaintiffs assert that their "research strongly implies

common, centralized policymaking emanating from the corporate headquarters, at the behest of

Mr. Demmings and implemented by Ms. Luthi." *Id.* Their "research" was sufficiently deficient

not to reveal that Mr. Demmings and Ms. Luthi have not lived in New York for many years. And

the evidence belies the argument that the locus of operative facts is anywhere except where the

employees were subjected to discrimination.

As noted, Defendant disputes that any relevant policymaking occurred in its New York headquarters when it maintained that headquarters – which it no longer does. Defendant submitted declarations stating that no members of senior management of Automotive or Connected Living (the divisions the five Plaintiffs work/worked in) live in New York (Dkt. No. 43 ¶ 17); Assurant's New York office was dedicated to functional support areas and was not involved in the day-to-day operations of the various lines of business (Dkt. No. 35 ¶ 15); no hard copy documents regarding the management of Automotive or Connected Living are in New York (Dkt. No. 43 ¶¶ 15, 16); and Assurant's CEO Demmings has long been located in Georgia, while CAO Luthi was located in Utah and Florida.

Moreover, Defendant emphasizes that none of the events actually alleged in the SAC took place in New York. The locus of many operative facts is Georgia. Indeed, considering the allegations of each of the named Plaintiffs in turn, it is clear that each of Plaintiffs Judson, Bacon, Stein and Steen's allegations have a strong factual connection to Georgia and none to New York. Moore's do not relate to Georgia, but his are not connected to New York either.

Plaintiff Judson is a resident of Georgia and was a District Manager in Assurant's Southeast Region, which includes Florida, Puerto Rico, Southeast Georgia and South Alabama. SAC ¶¶ 37, 87. Judson's immediate supervisor for 10 years was Bond, who was based in Atlanta, Georgia. *Id.* ¶¶ 152, 6. While the location of Judson's office is not specified, Judson alleges that he overheard Bond saying on a daily basis, "whatever goes on in Atlanta . . . stays in Atlanta," suggesting that Judson was also Atlanta based. *Id.* ¶¶ 161. This allegation of fact undercuts any suggestion that Bond might have been following directions that emanated from New York. The majority of Judson's allegations of discrimination concern Bond: he alleges that

Bond made various discriminatory comments, removed accounts from him, gave discriminatory compensation, and retaliated against him. *Id.* ¶¶ 152-161, 166-74. Judson also alleges that he complained about Bond to two HR employees – Bieller and Rosado-Reyes – both of whom live in Georgia, and Rosado-Reyes works out of Assurant's Atlanta offices. *Id.* ¶¶ 169; Dkt. No. 74 at 15. These allegations are sufficient to conclude that Judson's claims arise out of conduct by Defendant in Georgia.

Bacon is a resident of Georgia (SAC ¶ 39) and a District Manager in Assurant's Southeast Region (location unspecified but certainly not New York). *Id.* ¶¶ 87, 231. The majority of Bacon's claims concern discriminatory conduct that Bacon faced from Bond, which created a "severely racist work environment." *Id.* ¶¶ 235-240. One example is alleged to have taken place during a work trip in Georgia: the SAC describes how, during this trip, Bacon was told by Bond that slaves had "been treated well by slaveholders" and were lucky to have been brought to America. *Id.* ¶¶ 235-36. Bacon further alleges that, on a separate occasion, Bond stated that he hated the "culture" of Bacon's race. *Id.* ¶ 238. As Bacon's allegations primarily concern Bond, who was located in Atlanta, Georgia, his claims are related to Defendant's contacts with Georgia.

While Stein is currently a Florida resident, (SAC ¶ 38), for the period at issue in the SAC, he is alleged to have worked for Defendant in Georgia. Indeed, the SAC specifically alleges that Stein was assigned to a sales district in Georgia and South Carolina in 2015, rather than his preferred location in Florida. *Id.* ¶ 187. Additionally, Stein alleges that he was told that if he did not move to Savannah, Georgia then he would lose his job at Assurant. *Id.* ¶ 189. When Stein relocated to Florida in 2017, his sales territory did not change. As a result, Stein alleges that he travelled back and forth to Savannah on a weekly basis and was required to pay over $1000 a

month on travel and living costs in Savannah for more than four years. *Id.* ¶ 193, 195. In light of the fact that Stein's claims stem from his employment with Defendant in Georgia, the locus of operative facts is in Georgia.

Plaintiff Steen is also a Florida resident. SAC ¶ 36. Stein joined Assurant in 2007. In 2011, he was promoted to Area Manager in the company's Southeast Region. *Id.* ¶ 85, 87. Over the last 15 years, Steen has reported directly to Brown – based in North Carolina (Dkt. No. 42 ¶¶ 2, 7) – who reported directly to Bauer and Amendola – two Vice Presidents at Assurant based out of Chicago. Dkt. No. 41 ¶ 2, Dkt. No. 44 ¶ 2. None of them undoubtedly lived or worked in New York. While Steen primarily alleges that he was subject to discrimination from these managers – particularly with respect to not receiving a promotion – he also alleges that he was subject to discrimination from Assurant employees based in Georgia. Specifically, Steen alleges in detail the discrimination he too faced from Bond, describing comments that Bond made, such as "Slavery was not all that bad for slaves because they had food and shelter from slave owners" and "The [African] slaves should have been happy that they were no longer in Africa." SAC ¶¶ 117-18. He also discusses an incident in which Bond displayed three semi-automatic firearms on top of his desk during a meeting and then proceeded to point them into his camera at other employees. *Id.* ¶¶ 121-126.

In addition, Steen alleges that Jeffrey Strickland, who lives and works in the Northern District of Georgia (Dkt. No. 49 ¶ 16), participated in adverse employment decisions regarding Steen. For example, Steen alleges that Strickland "supervises Mr. Steen's boss, Mr. Brown" and was a "key decision maker in connection with who would receive [a] promotion." *Id.* ¶ 64. Steen further alleges that Strickland was involved in a decision to demote Steen. *Id.* ¶ 136-37, 142.

Therefore, as certain of Steen's allegations concern Assurant employees based in Georgia, key operative events from which his claims arise occurred in Georgia.

In contrast to the other named Plaintiffs, who all work or formerly worked as an Area or District Manager in the Southeast Region of Global Automotive, Plaintiff Moore worked as a Senior Channel Optimization Executive for Assurant's Connected Living division in the Washington D.C. area and is a resident of Maryland. SAC ¶¶ 40, 243. Moore's allegations do not have any connection to Georgia. Moore primarily alleges that he was repeatedly passed over for promotions and opportunities in favor of white peers, despite exceeding performance goals and expectations. *Id.* ¶ 246, 249-64. However, his allegations are vague and do not specify where the Assurant employees involved in the promotion decisions worked or lived, suggesting that they, like him, worked in Washington D.C. or Maryland – in the Mid-Atlantic area of the U.S. So the locus of operative facts is likely Washington D.C. or Maryland. But it is not New York. Moore chose to join his claims with those of the other Plaintiffs, so he goes where they go. If he wishes to sever his claims from those of the other named Plaintiffs, the judge in the Northern District of Georgia can consider where his case might more properly be heard.

On the whole, then, the locus of operative facts for the named Plaintiffs is in the Southeastern United States and New York is not the locus of operative facts for any of the named Plaintiffs. Plaintiffs offer not a scintilla of evidence that any of the employment decisions and behaviors they challenge as discriminatory were either made or directed by anyone in New York. This strongly favors transfer and for this court is determinative.[6]

---

[6] To the extent that Plaintiffs are attempting to ground their "locus of operative facts" analysis in New York because they are seeking to represent a nationwide class: (1) no class has yet been certified; (2) no class is likely to be certified in this case because the amorphous disparate treatment "employment practices" that are mentioned (though not identified) in the SAC appear

f.  *The Availability of Process to Compel the Attendance of Unwilling Witnesses*

Fed. R. Civ. P. 45(c)(1) states that a "subpoena may command a person to attend a trial,

hearing, or deposition only as follows: (A) within 100 miles of where the person resides, is

employed, or regularly transacts business in person; or (B) within the state where the person

resides, is employed, or regularly transacts business in person, if the person (i) is a party or a

party's officer; or (ii) is commanded to attend a trial and would not incur substantial expense."

Fed. R. Civ. P. 45(c)(1).

Defendant argues that the parties may not be able to compel Bond, a critical non-party

witness who resides in the Northern District of Georgia, to testify in this District. Defendant

notes that Bond's name appears sixty-nine times in the SAC, in forty-eight separate paragraphs.

Dkt. No. 89 at 9. Therefore, it argues that Assurant, Inc. would be substantially prejudiced if

Bond could not be compelled to appear at trial.

Plaintiffs argue that Bond's testimony could be introduced at trial using deposition

transcripts and that the potential lack of availability of one witness' testimony should not be a

reason to transfer the whole case. However, Plaintiffs have identified no witnesses who reside

within the Southern District, so given that Bond features heavily in the allegations of the SAC,

this factor weighs in favor of transfer.

g.  *The Remaining Factors Are Neutral*

*Trial Efficiency and the Interests of Justice.* Defendant argues that trial efficiency weighs

in its favor because, as of June 30, 2022, this District had more than twice the pending cases than

the Northern District of Georgia. In response, Plaintiffs note that the Southern District of New

York has almost three times as many district judges as the Northern District of Georgia, meaning

---

to be not amenable to class treatment. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 342
(2011). I thus discount the "class" aspect of the pleading in my analysis.

the caseload per judge is almost 20% higher in the Northern District of Georgia. Dkt. No. 77 at 23. Both districts are busy, this factor is neutral.

*Relative Means of the Parties.* Defendant argues that this factor supports transfer. "Where disparity exists between the parties, such as an individual plaintiff suing a large corporation, the relative means of the parties may be considered." *Coast to Coast Fabrics, Inc. v. Exact Change Only Corp.*, No. 04–cv–7300 (DAB), 2006 WL 846716, at *5 (S.D.N.Y. Mar. 29, 2006). Therefore, Defendant argues that transfer would make this litigation more economical for Plaintiffs, but Plaintiffs contend that they have no issue traveling to New York City. Thus, this court finds that this factor is neutral.

*The Forum's Familiarity with the Governing Law.* "Familiarity with the governing law as a factor in determining transfer of venue is generally given little weight in federal courts[.]" *Am. Eagle Outfitters, Inc. v. Tala Bros. Corp.*, 457 F.Supp.2d 474, 479 (S.D.N.Y.2006). Plaintiffs' ADEA and Section 1981 claims are federal law claims, over which either forum can knowledgeably preside. This factor is therefore neutral.

\*\*\*

In sum, no factor weighs in favor of keeping this case in New York, while multiple factors favor the Northern District of Georgia. Therefore the motion to transfer is granted.

**CONCLUSION**

For the foregoing reasons, Defendant's motion to transfer this case is GRANTED. This constitutes the decision and order of this court.

The clerk is directed to close the open motion at Docket Number 73.

Dated: July 6, 2023

U.S.D.J.

BY ECF TO ALL COUNSEL